UNITED STATES DISTRICT COURT
FILED
MAY 2 5 2017
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

DONOVAN A. HOUGH,

               Petitioner,

      v.

UNITED STATES OF AMERICA,

               Respondent.

**DECISION AND ORDER**

1:12-CV-00945 EAW
1:89-CR-00115 EAW

## **INTRODUCTION**

In 1990, the petitioner, Donovan Hough ("Petitioner"), was convicted by a jury of various felony charges, including drug and gun crimes, and he was sentenced to 40 years in prison. On October 5, 2012, proceeding *pro se*, Petitioner filed a petition pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. (Dkt. 210).[1] Petitioner seeks to vacate his conviction and sentence on the grounds that he was denied effective assistance of counsel. (Dkt. 211 at 1-3). Petitioner claims that his attorneys failed to "give any advi[ce] concerning the acceptance of a plea bargain," and/or communicate plea offers. (*Id.* at 9; Dkt. 225 at 6, 8).

On April 11, 2016, the Court found outstanding questions of fact existed regarding the communications surrounding Petitioner's plea negotiations and concluded that an evidentiary hearing was necessary. (Dkt. 238 at 7-11). An evidentiary hearing was held

---

[1]    All documents related to the instant case were filed in the related criminal case, 1:89-CR-00115, and therefore all docket references appear under that criminal case docket.

on September 7 and September 9, 2016, before the undersigned. (Dkt. 255; Dkt. 256; Dkt. 257; Dkt. 259). In relation to the hearing, Petitioner filed a motion *in limine* to preclude certain testimony at the hearing. (Dkt. 252). At the hearing, the undersigned reserved decision on those evidentiary issues, allowing the testimony to come in for the purpose of making a determination as to whether to consider the evidence in making an ultimate decision on the petition. (Dkt. 257 at 3).

As set forth below, the Court finds that Petitioner has failed to meet his burden to show that he received ineffective assistance of counsel during and leading up to his criminal trial between 1989 and 1990. Accordingly, the petition is denied with prejudice.

## FACTUAL HISTORY

Petitioner was convicted of various crimes in 1990 after a jury trial before United States District Judge Arcara. (Dkt. 90). On June 14, 1991, Judge Arcara sentenced Petitioner to imprisonment of 40 years. (Dkt. entry on 6/14/1991). Petitioner appealed his conviction, and the United States Court of Appeals for the Second Circuit affirmed the judgment on April 9, 1992. *United States v. Bolden*, 963 F.2d 1521 (2d Cir. 1992) (Table). In July of 1992, Petitioner filed a petition pursuant to 28 U.S.C. § 2255, which was denied on September 27, 1993. (Dkt. 158; Dkt. 167). The Second Circuit dismissed three attempted appeals of this denial. (2d Cir. Dkt. 93-2709; 2d Cir. Dkt. 94-2691; 2d Cir. Dkt. 95-2623). Petitioner filed a second petition pursuant to 28 U.S.C. § 2255 in March of 1997 (Dkt. 177), which was transferred to the Second Circuit pursuant to 28 U.S.C. §§ 2244(b) and 2255(h). (Dkt. entry on 4/18/1997). The Second Circuit issued an Order granting Petitioner permission to file his successive petition on April 29, 1997. (2d

Cir. Dkt. 97-3525; Dkt. 178). On February 26, 1998, Judge Arcara issued a Decision and Order granting the petition in part and denying it in part. (Dkt. 185). Because the terms of imprisonment on the vacated counts were to run concurrently with the imprisonment for the remaining counts, and because the order vacating certain of the counts did not change the length of the prison term, Judge Arcara determined that re-sentencing was not required. (*Id.*). The Court denied the certificate of appealability. (Dkt. 187).

Petitioner next moved on February 4, 2003, under Fed. R. Civ. P. 60(b) based on newly-discovered evidence. (Dkt. 192). The Court denied the motion on May 14, 2003 (Dkt. 195), which Petitioner appealed almost a year later on April 26, 2004. (Dkt. 198). Petitioner requested the Second Circuit grant leave to file a successive habeas petition. (2d Cir. Dkt. 04-4112). The Second Circuit denied the motion on September 22, 2004. (*Id.*).

Petitioner next sought a reduction in his sentence on December 12, 2005, pursuant to 18 U.S.C. § 3582(c), post-*United States v. Booker*, 543 U.S. 220 (2005). (Dkt. 199). The Court denied the motion (Dkt. 202), and the Second Circuit dismissed the appeal of that decision on June 15, 2006. (2d Cir. Dkt. 06-2025). Thereafter, Petitioner moved to reduce his sentence under 18 U.S.C. § 3582(c) pursuant to a retroactive amendment to the sentencing guidelines. (Dkt. 226). The case was then transferred to the undersigned on January 30, 2015, and in June 2015, this Court granted the motion, reducing Petitioner's sentence to 340 months on Count 1 of the indictment, or to 400 months overall. (Dkt. 235).

Presently at issue is Petitioner's motion to vacate under § 2255,[2] filed on October 5, 2013. (Dkt. 210). The petition alleges that Petitioner's trial counsel deprived him of constitutionally-effective assistance by failing to adequately negotiate a plea disposition for Petitioner during his criminal case. (*Id.*; Dkt. 211). He alleges that his first attorney, Carl Dobozin, who represented him from the time of his arrest in June 1989 through approximately September 1989, failed to attempt to negotiate a plea despite Petitioner's request that he do so. (*See generally* Dkt. 211). Similarly, he alleges that his second attorney, Alan D. Goldstein, delayed plea negotiations after Petitioner had requested that Mr. Goldstein engage in negotiations and did not follow up, relay any plea offers, or advise Petitioner of his potential sentencing exposure if convicted at trial. (*See generally id.*; Dkt. 225). Complicating the disposition of this issue is the fact that Mr. Goldstein is deceased.

## PROCEDURAL HISTORY

Petitioner filed the instant petition to vacate under § 2255 on October 5, 2012. (Dkt. 210). The Government responded on October 31, 2013 (Dkt. 223),[3] and Petitioner replied on November 20, 2013. (Dkt. 225). As referenced above, the case was transferred to the undersigned on January 30, 2015. (Dkt. entry on 1/30/2015). On April 11, 2016, the undersigned determined that an evidentiary hearing was necessary to resolve questions of fact left outstanding by the briefing. (Dkt. 238). The Government

---

[2] This petition is not successive as it is the first petition attacking the new judgment issued by the Court in 1998. (*See* Dkt. 188).

[3] The Government specifically waived its statute of limitations defense to this petition. (*See* Dkt. 237).

filed a hearing brief on August 8, 2016 (Dkt. 246), and Petitioner filed a hearing brief on the same date. (Dkt. 251). Petitioner also filed a motion *in limine* to preclude certain evidentiary testimony—specifically, certain testimony from the Assistant United States Attorney, Joseph M. Guerra, III, who handled the criminal trial, and from Robert N. Convissar, the attorney of Petitioner's co-defendant—on the basis of hearsay. (Dkt. 252). The evidentiary hearing was held on September 7 and September 9, 2016. (Dkt. 255; Dkt. 256; Dkt. 257; Dkt. 259). At the hearing, AUSA Guerra, Petitioner, and Mr. Convissar testified. (*See generally* Dkt. 237; Dkt. 259). Petitioner filed post-hearing briefing on December 12, 2016 (Dkt. 261), with the Government following suit on February 15, 2017. (Dkt. 266). Petitioner filed his reply on March 1, 2017. (Dkt. 268).

## DISCUSSION

### I.    Standard

The Sixth Amendment right to counsel is needed to "protect the fundamental right to a fair trial," and "the right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 684, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687. "[C]laims of ineffective assistance of counsel in the plea bargain context are governed by the two-part test set forth in *Strickland.*" *Missouri v. Frye*, 566 U.S. 133, 140 (2012). "The performance prong of *Strickland* requires a defendant to show '"that counsel's representation fell below an objective standard of reasonableness."'" *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (quoting *Hill v. Lockhart*, 474 U.S. 52, 57 (1985)). "To establish *Strickland* prejudice a defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 694)).

As it relates to plea offers, under the first *Strickland* prong, "[a] defendant suffers a Sixth Amendment injury where his attorney fails to convey a plea offer," and "[d]efense counsel have a constitutional duty to give their clients professional advice on the crucial decision of whether to accept a plea offer from the government." *Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003); *see Frye*, 566 U.S. at 145. When an attorney "grossly underestimate[s]" a client's sentencing exposure, the attorney has "breached his duty as a defense lawyer in a criminal case 'to advise his client fully on whether a particular plea to a charge appears desirable.'" *United States v. Gordon*, 156 F.3d 376, 380 (2d Cir. 1998) (quoting *Boria v. Keane*, 99 F.3d 492, 496 (2d Cir. 1996)). Under the second prong:

> [t]o show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel. Defendants must also demonstrate a reasonable probability the plea would have been entered without the prosecution

> canceling it or the trial court refusing to accept it, if they had the authority
> to exercise that discretion under state law.

*Frye*, 566 U.S. at 147. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which . . . will often be so, that course should be followed." *Strickland*, 466 U.S. at 697.

In addition, the Second Circuit has referred to an objective evidence rule relating to ineffective assistance of counsel claims, *United States v. Gordon*, 156F.3d 376, 380-81 (2d Cir. 1998); however, it later elaborated that the better reading of *Gordon* was not as propounding a strict objective evidence rule, but rather that, while "in most circumstances a convicted felon's self-serving testimony is not likely to be credible," "[t]his does not relieve habeas courts of their responsibility to actually make a credibility finding in each case, even absent objective evidence." *Purdy v. Zeldes*, 337 F.3d 253, 259 (2d Cir. 2003).

"Under the *Strickland* test, a petitioner carries a heavy burden," *Burton v. Phillips*, 303 F. App'x 954, 955 (2d Cir. 2008), as "[j]udicial scrutiny of counsel's performance must be highly deferential," and "counsel is strongly presumed to have rendered adequate assistance." *Strickland*, 466 U.S. at 689-90. The fact that Petitioner's attorney is deceased does not change the *Strickland* analysis. *See Slevin v. United States*, 71 F. Supp. 2d 348 (S.D.N.Y. 1999) ("While unfortunate, because the death of a petitioner's trial counsel is just as, if not more, likely to prejudice the respondent, it does not relieve the petitioner of his 'heavy burden' of proving ineffective assistance."), *declined to follow by Purdy v. Zeldes*, 337 F.3d at 259 on ground of use of strict objective evidence

rule; *see also Hauck v. Mills*, 941 F. Supp. 683 (M.D. Tenn. 1996) (applying *Strickland* standard despite death of the petitioner's trial attorney).

## II.    Evidentiary Issues

At the hearing, the undersigned reserved on the evidentiary issues raised by Petitioner's motion *in limine*, allowing admission of the evidence in order to better decide whether to consider the evidence in making an ultimate decision. Specifically, Petitioner takes issue with portions of the testimony of AUSA Guerra, the prosecutor on the original criminal case against Petitioner, and Mr. Convissar, the defense attorney of Petitioner's co-defendant, Russell Bolden. Petitioner moved *in limine* to preclude their testimony on the basis of hearsay. (*See* Dkt. 252; Dkt. 253). The Court will address the objection to each witness's testimony in turn.

### A.    AUSA Guerra Testimony

In Petitioner's motion *in limine*, he objected to AUSA Guerra's anticipated testimony about out-of-court conversations between AUSA Guerra and Mr. Goldstein regarding plea negotiations in which the Government alleged that "Mr. Goldstein advised on numerous occasions that, in sum and substance, Petitioner was unwilling to take a plea which exposed him to more than ten years' imprisonment." (Dkt. 252 at 2). AUSA Guerra testified to this at the hearing: "The sum and substance was Mr. Goldstein told me he had spoken to Petitioner about the government's plea offer and  Petitioner told him that he would not plead guilty to anything more than 10 years."[4] (Dkt. 257 at 47).

---

[4]     The Government attached an affidavit from AUSA Guerra to its moving papers as well, stating the same. (Dkt. 223-2).

Petitioner argues that this testimony is "double hearsay for which no exception applies that would permit the admissibility of such testimony." (Dkt. 252 at 3). The Government, on the other hand, contends that this is not hearsay under Fed. R. Evid. 801(d)(2)(A) and 801(d)(2)(D). (Dkt. 246 at 2-4). The Court agrees with the Government.

Rule 801(d)(2)(A) provides that a statement meeting the following conditions is not hearsay: "The statement is offered against an opposing party and . . . was made by the party in an individual or representative capacity." Here, the Government is offering Petitioner's statement to Mr. Goldstein that he would not accept a plea greater than 10 years against Petitioner—the opposing party—and the statement was made by Petitioner in his individual capacity. Thus, the Court can proceed to the analysis of the second level of hearsay: Mr. Goldstein's statements to AUSA Guerra.

The Government argues that AUSA Guerra's statements as to what Mr. Goldstein told him are not hearsay under Fed. R. Evid. 801(d)(2)(D), which acts as an exclusion to hearsay when "[t]he statement is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." While an attorney "does not have authority to make an out-of-court admission for his client in all instances, he does have authority to make admissions which are directly related to the management of litigation." *Hanson v. Waller*, 888 F.2d 806, 814 (11th Cir. 1989) (citing *United States v. Dolleris*, 408 F.2d 918, 921 (6th Cir. 1969)); *see also Marshall v. Mardels*, No. 75 C 598, 1978 WL 1698, at *3 n.1 (E.D.N.Y. July 17, 1978) ("The mere fact that an attorney represents a client does not make that attorney the

agent of the client; the question is whether the attorney has the authority to act as an agent and whether statements were made in the course of exercising that authority.") (citing 4 Weinstein's Evid. § 801(d)(2)(C)[01] at 801-127 (1977)).

Here, the testimony of AUSA Guerra established that the statements by Mr. Goldstein were made within the scope of his representation of Petitioner, during the time that he represented Petitioner, and they involved the subject matter of that representation (i.e., Petitioner's pending criminal charges and any potential disposition by plea). Additionally, according to Petitioner's own testimony, he asked Mr. Goldstein to negotiate a plea deal for him. (Dkt. 257 at 100). This testimony puts Mr. Goldstein's actions in talking to AUSA Guerra about a plea disposition squarely within his authority as Petitioner's agent. Thus, a plain view of the evidence suggests that the statements are admissible pursuant to Rule 801(d)(2)(D).

Nonetheless, Petitioner relies primarily on *United States v. Valencia*, 826 F.2d 169 (2d Cir. 1987), for the proposition that the agency exclusion to hearsay should not be applied in this case. (Dkt. 253). In *Valencia*, a defense attorney made informal statements to a prosecutor during an off-the-record discussion of the defendant's case. *Valencia*, 826 F.2d at 173. The court found that "the routine use of attorney statements against a criminal defendant risks the impairment of the privilege against self-incrimination, the right to counsel of one's choice and the right to effective assistance of counsel," but acknowledged that "the trial judge must be accorded considerable discretion in determining the application of Rule 801(d)(2) to statements of an attorney offered by the prosecutor against a criminal defendant." *Id.* at 172-73. *See also United*

*States v. McKeon*, 738 F.2d 26, 32 (1984) ("the free use of prior [statements] may deter counsel from vigorous and legitimate advocacy" on his client's behalf).

These legitimate concerns expressed by the Second Circuit have no applicability to the present case. Here, there is no risk of self-incrimination; Petitioner's criminal trial is long past, and the merits of it are not at issue. Similarly, Petitioner will not potentially lose the counsel of his choice because, again, the criminal trial is over 20 years past and his then-counsel of choice is now deceased. Likewise, admitting Mr. Goldstein's statements through AUSA Guerra will not and cannot have a deterrent effect on Mr. Goldstein's past advocacy for his client. Finally, the legitimate protection of Petitioner's right to effective assistance of counsel is the crux of the issue in this case—in other words, if Mr. Goldstein was still living, he would presumably be testifying at the hearing and, thus, the *Valencia*'s court's concerns about the use of counsel's statements against his client have no applicability to a proceeding such as this one. Petitioner is not in the middle of his criminal trial. Rather, he has opened the door to communications that he made to his counsel by filing this proceeding challenging the adequacy of Mr. Goldstein's representation. For these reasons, the Court finds that the concerns enumerated in *Valencia* and *McKeon* are not present here, the cases are distinguishable from the present case, and the holdings are not applicable.

## B. Mr. Convissar Testimony

Petitioner makes a similar argument about Mr. Convissar's testimony. Mr. Convissar testified, "Mr. Goldstein told me Petitioner was not willing to take the plea offer," and "Mr. Goldstein said he spoke to him and Petitioner didn't want to take the

plea." (Dkt. 259 at 25). This type of testimony arguably involves only one level of hearsay, not two, as Mr. Goldstein's impression that Petitioner did not want to take the plea could have been gleaned from his overall representation of Petitioner, rather than from one distinct statement by Petitioner. In any case, even if viewed as double hearsay, the first level—Petitioner's potential statement to Mr. Goldstein that he did not want to take the offer—is not hearsay under Rule 801(d)(2)(A). Thus, the Court need only analyze the second level of purported hearsay—Mr. Goldstein's statements to Mr. Convissar.

While the Petitioner tweaks his arguments somewhat as to the agency exclusion as it relates to Mr. Convissar,[5] the conclusion is the same. The concerns that presented themselves in *Valencia* and *McKeon* are not present here.

Petitioner's argument to the contrary is unpersuasive. He argues that, because there was no joint defense agreement, statements made by Mr. Goldstein to Mr. Convissar cannot fall within the scope of the agency relationship. Whether there was a joint defense agreement is irrelevant to the applicability of Rule 801(d)(2)(D). The issue is not the relationship between the two co-defendants and their respective counsel—the issue is the relationship between Mr. Goldstein and Petitioner and whether Mr.

---

[5]     Petitioner argues that *Valencia*, a case about the discussion between defense counsel and the prosecutor, applies with equal force to the testimony of Mr. Convissar, a defense attorney for a co-defendant, citing to deficiencies in the exchange such as a "lack of a record, [the fact that the statements were] not made in open court, [that the statements were] not made in the presence of the defendant, and [that Petitioner had] no opportunity to challenge the evidence." (Dkt. 253 at 6).

Goldstein's communications to Mr. Convissar were made within the scope of Mr. Goldstein's relationship with Petitioner.

Mr. Convissar testified at the September 9, 2016 hearing that he and Mr. Goldstein met five to six times in the two weeks leading up to the trial, speaking of both trial preparation and the potential taking of a plea. (Dkt. 259 at 26, 49). As supported by Mr. Convissar's testimony, and as supported by the statements themselves, Mr. Goldstein's statements concerning Petitioner's position with respect to any plea were plainly within the scope of Mr. Goldstein's authority as Petitioner's agent. Accordingly, Mr. Convissar's testimony is also admissible.

## III.   The Hearing Testimony

### A.   AUSA Guerra Testimony

AUSA Guerra began his testimony by explaining that the first indictment that Petitioner faced carried a statutory maximum of 20 years based on a charge of drug conspiracy plus a consecutive five years for the gun charges. (Dkt. 257 at 20). He indicated that there was no mandatory minimum under the initial indictment for the drug charge. (*Id.*). He did not recall Mr. Dobozin inquiring as to a plea nor as to Petitioner's exposure if he were to be convicted at trial.[6] (*Id.* at 22). He explained that, when the superseding indictment was issued, the new first count of continuing criminal enterprise

---

[6]   AUSA Guerra did testify that, leading up to the superseding indictment, the Government was subpoenaing "a lot of financial records . . . so that [it] could present financial charges to the grand jury." (Dkt. 257 at 74). He stated that, "from the government's standpoint, the case could not be disposed of until [it] had finished [its] investigation with respect to the tax charges because any plea agreement would have to include potential tax charges." (*Id.*).

("CCE") carried a mandatory minimum of 20 years, in addition to the same five-year mandatory consecutive term for the gun charges as in the initial indictment. (*Id.* at 29).

AUSA Guerra testified about a call with Mr. Goldstein on November 30, 1989, using his notes from the call. (*Id.* at 32-33). He testified that Mr. Goldstein called him regarding a plea, which he then discussed with the case agent. (*Id.* at 35). AUSA Guerra and the case agent discussed that a sentence within the range of 15-20 years would be appropriate. (*Id.* at 36). The agent wanted AUSA Guerra to attempt to get a plea for the CCE count and they discussed a plea to a pre-November 1988 CCE violation, which would lower the mandatory minimum from 20 years to 10 years. (*Id.*). AUSA Guerra testified to calling Mr. Goldstein back and telling him that he would offer a pre-November 1988 CCE plea disposition carrying a minimum of 10 years to a maximum of life, including a guilty plea to a tax count in the superseding indictment that would not carry any additional time as well as a forfeiture. (*Id.* at 36-37). He testified that he "can't believe [he and Mr. Goldstein] wouldn't have discussed the parameters of what the likely sentencing would have been" post-conviction during their conversation, as "just telling him a 10 to life plea and these other things really wouldn't have advanced the discussion much unless at least [he] gave him an idea of what timeline the government was looking at." (*Id.* at 37).

Next, AUSA Guerra testified about a March 8, 1990 phone call during which Mr. Goldstein asked AUSA Guerra to calculate the guidelines for a plea. (*Id.* at 39). To the best of his knowledge, the plea offer was still to the pre-November 1988 CCE with the statutory range of ten years to life. (Id. at 40-41). Following this call, AUSA Guerra

- 14 -

testified that he figured out what the guidelines were and relayed them to Mr. Goldstein shortly after their March 8 conversation: 121-151 months (roughly 10-12 years) for the pre-November 1988 CCE count and 5 years for the gun charges. (*Id.* at 41-44).

AUSA Guerra testified that he had another phone conversation with Mr. Goldstein on April 12, 1990, and an in-person conversation, though he could not remember which came first. (*Id.* at 47). The substance of the in-person conversation was that Mr. Goldstein told AUSA Guerra that he had spoken to Petitioner about the plea offer and that Petitioner told Mr. Goldstein he would not plead guilty to anything more than 10 years. (*Id.*). He testified that both in the April 12 phone conversation and the in-person conversation, he conveyed to Mr. Goldstein that the Government was willing to modify its plea proposal such that it would no longer recommend the high end of the 121-151 months range. (*Id.*).

During the April 12 phone call, AUSA Guerra reiterated the plea offer and asked whether the plea was going to go through. (*Id.* at 50). AUSA Guerra testified that his notes of the call indicated that a 10-year plea is the only plea Petitioner would take. (*Id.*). He also confirmed that the plea offer would expire on April 18, 2000. (*Id.* at 50-51). AUSA Guerra called Mr. Goldstein again that same day, shortly after the first phone call, and told him that, if Petitioner were to be convicted at trial, his offense level would a "36, etc." (*Id.* at 52). He elaborated that the use of "etc." meant that "there was something else in addition to the offense level 36," perhaps "additional [g]uideline enhancements or adjustments or a reference to the statutory mandatory minimum penalty." (*Id.* at 53, 85). He stated that he did not want his answer to come off as though 36 was the final

guidelines number he represented because he was not sure, given the "etc." in his notes, if that would be accurate. (*Id.* at 53). He testified that the "etc." meant that he and Mr. Goldstein did discuss more than the offense level of 36, but he could not remember what, specifically, was discussed. (*Id.*). AUSA Guerra testified that Mr. Goldstein would let him know if Petitioner changed his mind. (*Id.* at 52).

AUSA Guerra testified that the final adjusted offense level for Petitioner ended up being a 40. (*Id.* at 57). This meant that a post-conviction sentence would be 360 months to life in addition to the five-year sentence for the gun charges. (*Id.* at 58). Despite this, AUSA Guerra testified, upon being shown Mr. Goldstein's sentencing memorandum filed with the Court, that Mr. Goldstein indicated that the 360 months to life was *inclusive* of the gun charges. (*Id.* at 58-59). Upon being shown the Government's reply to Mr. Goldstein's memorandum, he testified that the Government corrected Mr. Goldstein, as the 360 months (30 years) to life was not inclusive of the gun charges; rather, Petitioner was facing 420 months (35 years) to life. (*Id.* at 59).

AUSA Guerra verified that, on April 18, 1990, he called Mr. Goldstein, who indicated to him there would be no plea. (*Id.* at 61-62). He stated that he also had a call with Mr. Convissar that day with respect to the plea that he had offered Mr. Bolden. (*Id.* at 62). However, he also testified that, as they came closer to trial, he had a vague recollection of discussions such that a plea was still a possibility, so essentially the "drop dead date" was withdrawn. (*Id.* at 60, 63-65, 80). He stated that he had a "bit of a recollection that either both defendants had to plead or if only one defendant was going to

plead, then he would have to agree to testify against the other defendant."[7] (*Id.* at 81, 86).

Between April 18, 1990 and the beginning of trial, AUSA Guerra testified that conversations with Mr. Goldstein about why a plea was not forthcoming remained that Petitioner would not plead guilty to anything more than a "definite 10 years." (*Id.* at 81-82). AUSA Guerra testified that Mr. Goldstein said this information came from Petitioner. (*Id.* at 83).

AUSA Guerra testified that the difference between the sentence Petitioner received—40 years—and the plea that was offered—10 years to approximately 12 and a half years—was quite a discrepancy. (Dkt. 259 at 57).

As to the plea deal offered to Mr. Bolden, AUSA Guerra indicated that he offered a 5-8 year plea with cooperation and a 10-12 year plea without cooperation. (Dkt. 257 at 91).

## B.    Petitioner Testimony

Petitioner testified that he received notice that Mr. Goldstein had died after filing his petition. (*Id.* at 97). He testified to discussing resolving the case via plea with his

_____

[7]     The testimony was not clear about whether the need for either a joint resolution or cooperation was the case throughout plea discussions or whether this was the case only as trial neared. AUSA Guerra initially indicated that there was no indication in his notes about a contingency for cooperation on Mr. Bolden's plea position. (Dkt. 257 at 86-87). Petitioner tried to make out a case that a plea requiring cooperation was operative only as trial neared, given the lack of any mention of cooperation in AUSA Guerra's notes, and the fact that AUSA Guerra called Mr. Goldstein and Mr. Convissar separately on April 18, 1990, to see if either defendant would accept a plea. (*Id.* at 86-88). However, AUSA Guerra recalls either a joint disposition, or the cooperation of one against the other, being important from the beginning (*id.* at 88), and ultimately highlighted that his notes of the March 8th phone call indicated "testify versus Bolden." (*Id.*). He elaborated that this was probably not discussed on the call, but rather was a note to himself to "remember to factor in potential testimony against Bolden and a resolution on the case." (*Id.* at 94).

- 17 -

first attorney, Mr. Dobozin, during Mr. Dobozin's representation between June and September or October 1989. (*Id.* at 97-99). He stated that Mr. Dobozin never told him what sentencing exposure he faced if convicted on the initial charges. (*Id.* at 99). He also testified that he did not know "what mandatory minimum sentences the charges [he] faced in the . . . original indictment," but that he understood they carried "a lot of time." (*Id.* at 101). However, in his memorandum of law attached to his petition for relief, Petitioner indicated, "after having the above conversation with Mr. Dobozin, it was understood that I would ultimately face a mandatory minimum of 10 years for relevant conduct relating to the drug conspiracy and 5 year consecutive time for the gun charges." (*Id.* at 113; Dkt. 225 at 3-4).[8]  He stated that Mr. Dobozin never informed him whether there was a plea offer made by the government. (Dkt. 257 at 99).

Petitioner testified that he similarly asked Mr. Goldstein, who represented him when he was arraigned on the superseding indictment, for a plea without cooperation. (*Id.* at 100). As to the superseding indictment, Petitioner testified that he knew he faced a mandatory minimum of 25 years prior to trial, (*id.* at 114, 124-25; Dkt. 211 at 10), and at another point stated that he knew his exposure was mandatorily at least 20 years stemming from the CCE alone in the superseding indictment, though Mr. Goldstein never "really" advised him that the CCE carried 20 years. (*Id.* at 102). He stated that Mr. Goldstein never advised him about an opportunity to plead guilty to the pre-November

---

[8]     The Court notes that there were no mandatory minimums relating to the first indictment for the drug charges. (Dkt. 257 at 20).

1988 CCE charge, which would have significantly reduced the mandatory minimum, nor about a 10-12 year plea offer. (*Id.* at 101-102).

However, Petitioner stated that he believed Mr. Goldstein did advise him of a 12-15 year plea offer, and that he told Mr. Goldstein he would only consider a plea without cooperation. (*Id.* at 102-103). Petitioner also testified that when Mr. Goldstein asked if Petitioner wanted him to contact the U.S. Attorney's Office before trial, Petitioner asked Mr. Goldstein what he thought. (*Id.* at 126-27, 130-31). Mr. Goldstein then indicated that he would try to secure a plea between 12 and 15 years. (*Id.* at 127, 131). Petitioner testified that he told Mr. Goldstein that it would have to be without cooperation, but that he would have taken such a plea. (*Id.* at 127-28*)*. He testified Mr. Goldstein never followed up after that day, nor did he advise Petitioner of what his sentencing exposure would be post-conviction or of the sentencing guidelines, noting that he was not aware of what the sentencing guidelines were until after he was convicted. (*Id.* at 103-104, 132-33). He testified that the first time he was made aware of the sentencing guidelines was from a presentence investigation report after his conviction. (*Id.* at 104). He stated that if he had known he was facing a minimum 35-year guideline sentence, he would have taken a 12-15 year plea, a 10-12 year plea without cooperation, or a 10-year plea without cooperation. (*Id.* at 105-106, 131).

On cross examination, he was confronted with the memorandum accompanying his petition, stating that, under the initial indictment, "I would have been sentenced to . . . 10 years for the mandatory minimum for drugs and a consecutive 5 years for the gun totaling a 15 years [sic] plea." (Dkt. 211 at 12). When asked whether, based on this, he

would have taken a 15-year plea, Petitioner first responded yes, if it had been without cooperation, (Dkt. 257 at 116), then soon after retreated and said he would have "considered it." (Id. at 116-17). He later reiterated that he would have "considered" a 15-year plea. (*Id.* at 123-24).

Petitioner was confronted with the same document as to the superseding indictment stating, "[t]he same hold's [sic] true had a negotiated plea been pursuant to the [s]uperseding . . . [i]ndictment, since I would have been subjected to a 20 year mandatory minimum sentence for the []CCE[] and an additional 5 years for the . . . gun count, totaling a 25 year plea." (Dkt. 211 at 12). When asked whether this meant he would have taken a 25-year plea, he explained that assistants in the law library will help compile documents for prisoners and, if said documents are in the "ballpark" of what the prisoner is trying to convey, they will often sign off on it. (Dkt. 257 at 117). He stated that he would have *considered* any plea if it had been without cooperation. (*Id.* at 118, 123-24). He also admitted, when asked specifically about a 10-12 year plea, that if the plea included cooperation, he likely would not have taken it, (*id.* at 122), but would have taken the same offer without cooperation. (*Id.* at 106). Petitioner was later asked about a sentence in his memorandum accompanying his petition stating: "I would have pled guilty both times to the initial 3 [C]ount [I]ndictment, during attorney Mr. Dobozin's representation and the [S]uperseding [I]ndictment during my representation by attorney Mr. Goldstein. . . . [h]ad it not been for the failure to negotiate a plea for me and/or give me any advise [sic] on my exposure by pleading guilty or going to trial." (Dkt. 211 at 12). Petitioner was asked whether it was a fair statement that the above-quoted line

indicated he would have pleaded guilty to either the first indictment or the second, and Petitioner responded "I don't think so, no." (Dkt. 257 at 124).

Petitioner testified that he had no recollection one way or the other of plea discussions taking place in the courtroom on the eve of trial, (*id.* at 133-34) but that he would have taken a plea offer of 10-12 years if both he and Mr. Bolden had to testify against each other and no one else, or if they were able to engage in a joint resolution. (*Id.* at 107-108, 125-26, 130, 131-33). He also stated that the opportunity for a joint resolution was never made known to him until the September 7, 2016 hearing. (*Id.* at 125, 129-30, 133).

During his testimony, Petitioner clarified that his claim against Mr. Dobozin was that he did not negotiate a plea deal and his claim against Mr. Goldstein was that he did not convey any plea deals, which he would have taken and/or considered. (*Id.* at 119-122; *see also* Dkt. 225 at 6, 8). He also stated that Mr. Goldstein never conveyed to him that the proof against him at trial was likely to be damaging, but rather told him that the Government's case was weak because it was built only on testimony, and the Government was unlikely to give him a plea deal without cooperation, acknowledging that there were at least some plea discussions between himself and Mr. Goldstein. (*Id.* at 135-36).

### C. Mr. Convissar Testimony

Mr. Convissar testified that he represented Mr. Bolden starting at the beginning of 1990, replacing Mr. Bolden's previous attorney, Glen Davis. (Dkt. 259 at 8-9, 10). He stated that he joined relatively early in the progression of the case and that, during the

pretrial phase of the criminal case and right up through trial, he was engaged in plea discussions with AUSA Guerra on behalf of his client. (*Id.* at 10). He stated that it was very important for him and his client to pursue a plea because he did not expect trial to have a desirable outcome for his client. (*Id.* at 11-12). He indicated that he had conversations with Mr. Goldstein about their clients and the case and discussed how to proceed in a mutually agreeable manner, be it plea or trial, despite the fact that there was no joint defense agreement. (*Id.* at 13-14, 37).

Mr. Convissar indicated that he received a plea proposal from AUSA Guerra of seven years if Mr. Bolden were to cooperate against Petitioner and that he had the feeling that a plea deal without cooperation was not on the table. (*Id.* at 15-16). He indicated that "25 years plus" would have been the outcome of an adverse trial. (*Id.*). Because his client was not willing to "roll over on" Petitioner, Mr. Convissar also spoke with AUSA Guerra about Petitioner's plea disposition offer in an effort to explore a "package plea" that would serve his client's best interests and not require cooperation. (*Id.* at 16). He testified that AUSA Guerra told him the offer as to Petitioner was 13 years. (*Id.* at 17). He advised his client to discuss with Petitioner the option of taking AUSA Guerra's plea, because otherwise they would have to sit through an unfavorable trial. (*Id.* at 19-20). He testified that he knew Mr. Bolden spoke to Petitioner regarding this matter. (*Id.* at 20). He also testified that one of his strategies was to try to get word out that his client might be taking a plea, and thus incentivize the otherwise unwilling Petitioner to take a plea, in which case, neither would ultimately have to testify against the other; however, that scenario did not play out. (*Id.* at 20-21).

Mr. Convissar testified that he and Mr. Goldstein met regularly the week or two leading up to trial—at least five or six times—and were in "constant communication." (*Id.* at 22, 25-26). He stated that a plea deal was always on "the top of" his and Mr. Goldstein's minds, and that the topic came up between five and eight times leading up to trial—especially the closer they came to trial, as it was becoming clearer that the trial would not have a favorable resolution for either of the attorneys' clients. (*Id.* at 22, 26, 49). He testified that Mr. Goldstein told him that Petitioner would not take the plea deal, but that Mr. Goldstein did not articulate why. (*Id.* at 25).

Mr. Convissar testified to a vivid recollection of a specific discussion relating to a plea that took place in the courtroom—just as a jury was about to be chosen. He recalls speaking across Mr. Goldstein and Mr. Bolden to Petitioner—because he was the defendant unwilling to take the plea—that this was their "last chance" and that there was a significant downside to going through trial, but a significant upside to pleading to 7 and 13 years, respectively. (*Id.* at 26-28, 30). He testified that he believed this was the first time he had had a conversation about pleas in Petitioner's presence. (*Id.* at 28). He stated that he viewed Petitioner as unwilling to take the plea because of the "reality [that he was] . . . picking a jury and [his] guy was willing to take the plea and the other guy wasn't." (*Id.* at 46). He testified that he did not hear Petitioner say "no" explicitly to taking this "last chance" plea offer, but that the result of the conversation was a "no." (*Id.* at 28). He agreed that the gist of the discussion was that the then-defendants were facing "a lot more time," and confirmed that he specifically used the words "last chance." (*Id.* at 35). Despite AUSA Guerra's testimony to the contrary, Mr. Convissar did not

- 23 -

recall a plea deal offered from AUSA Guerra without cooperation, but stated that, if one was presented, he certainly would have presented the offer to his client, and would have recommended it to him if it were "significantly lower than 25 years." (*Id.* at 43, 53-54). He verified that his client would have taken the seven-year plea offered to him if it did not involve cooperation. (*Id.* at 45).

## IV.   Application

Having considered the admissible evidence outlined above, the Court cannot find that Petitioner has met his heavy burden of establishing ineffective assistance of counsel.[9]

First, Petitioner has not shown that Mr. Goldstein's representation fell below an objective standard of reasonableness stemming from not conveying plea offers to Petitioner. AUSA Guerra credibly testified that Mr. Goldstein repeatedly engaged in plea discussions and consistently relayed that Petitioner would not accept a plea to anything more than a fixed term of 10 years—an offer that was never made by the Government. (*See* Dkt. 257 at 47; Dkt. 259 at 62). Moreover, Mr. Convissar credibly testified that a potential resolution was a priority for him and Mr. Goldstein as the trial date approached, and in an incredibly vivid fashion he described his last-ditch attempt to convince Petitioner to accept a plea just prior to the start of the jury selection. (Dkt. 259 at 26-28,

---

[9]     The Court only analyzes the claim as to Mr. Goldstein. There is no evidence that a plea offer was ever conveyed to Mr. Dobozin nor that the Government was in a position to enter into plea negotiations during Mr. Dobozin's representation. (*See* Dkt. 257 at 74). As Petitioner's counsel put it in her closing to the Court at the September 9, 2017 hearing: "[W]e've certainly narrowed the claim as to Carl Dobozin. There is no evidence that there was an offer made to Petitioner through Mr. Dobozin at the time Mr. Dobozin represented him." (Dkt. 259 at 67). Thus, the inquiry as to Mr. Dobozin is moot.

30, 35). In other words, the testimony of both AUSA Guerra and Mr. Convissar, who were on opposing sides during the period in question, shows that Mr. Goldstein did, in fact, convey the plea offers to Petitioner. Petitioner's attempts to attack this testimony as incredible due to certain relatively minor inconsistencies is unpersuasive.[10] Instead, it was Petitioner's testimony that was inconsistent and not credible, contending that Mr. Goldstein did not discuss plea offers but, at other times, admitting that there were at least some plea discussions.

Second, even if Mr. Goldstein never conveyed a plea offer to Petitioner, Petitioner has not shown that he was prejudiced. The credible evidence established that Mr. Convissar informed Petitioner of the plea offer on the eve of trial under circumstances where Mr. Bolden would have taken a joint resolution if Petitioner had agreed. (Dkt. 259 at 26-28, 30). In other words, although Petitioner testified that he would not have taken a plea with cooperation, he testified that he would have agreed to a joint resolution involving him and Mr. Bolden. (Dkt. 257 at 107-108, 125-26, 130, 131-33). Mr. Convissar informed him of a plea offer on the eve of trial under which his client was willing to enter into a joint resolution, and yet Petitioner refused to go forward with a plea.

---

[10]    Petitioner attempts to cast doubt on Mr. Convissar's reliability in particular, by for example stating, "Mr. Convissar . . . testified that [Petitioner] was offered a deal of thirteen years, but we know from AUSA Guerra that his offer was in fact 10 to 12 years with the government making no recommendation at the high end of the range." (Dkt. 261 at 9 n.2). However, the Court agrees with the Government that Mr. Convissar's representation of 13 years as opposed to the range of 10 years and 1 month to 12 years and 7 months (121-151 months) is not significant enough a variation between his recollection and the reality after 26.5 years for a party who was not even his client so as to find the testimony inconsistent or incredible. (See Dkt. 266 at 11 n.4).

Petitioner argues that there were three separate plea deals offered: (1) 121-151 months for a guilty plea to the pre-November 1988 CCE and tax evasion, including forfeiture; (2) 121-151 months for a guilty plea to the same, except that the Government would no longer advocate for the high end of the range; and 3) the same offer as (2) except now both Petitioner and Mr. Bolden would have to plead guilty, or one would have to testify against the other. (Dkt. 261 at 4-9). The thrust of Petitioner's argument seems to be that, if the first two plea offers were without cooperation, Petitioner was prejudiced if he was not advised of the offers, given Petitioner's testimony that he would have considered any plea without cooperation. (Dkt. 257 at 118, 123-24). Then, even if Mr. Convissar advised Petitioner about a plea offer on the eve of trial, it was now only available *with* cooperation, thus prejudicing Petitioner.

The Court does not read the evidence this way. In addition to Mr. Bolden's willingness to enter into a joint resolution, as discussed above, the record is not clear enough to determine that the first two of the three offers that the Petitioner enumerates were, in fact, without cooperation. AUSA Guerra testified that he had a recollection that cooperation or a joint resolution was important from the start, and had notes indicating that he was at least considering Petitioner testifying against Mr. Bolden in his calculations. (*Id.* at 88). Petitioner's reliance on a *lack* of reference to cooperation between AUSA Guerra and Mr. Goldstein in AUSA Guerra's notes does not satisfy his burden of affirmatively showing prejudice.

Most importantly, even disregarding the contested portion of the testimony of both AUSA Guerra and Mr. Convissar with respect to Mr. Goldstein's statements, Petitioner

has not established prejudice because his testimony did not establish that he would have accepted any of the pleas extended by the Government. Petitioner testified, when asked specifically about a 10-12 year plea, that if the plea included cooperation, he likely would not have taken it. (*Id.* at 122). When asked about a 10-12 year plea without cooperation or with a joint resolution, he stated at one point that he would have taken the offer (*id.* at 106, 107-108), but at another point in his testimony he indicated that he would have simply *considered* the offer. (*Id.* at 118, 122). As discussed above, the record is too unclear to determine that cooperation was initially not a required element of the Government's plea offer. In other words, in light of the fact that Petitioner definitively stated he most likely would *not* have taken an offer including cooperation and that there is no reliable indication that *not* cooperating was ever an option, Petitioner's argument fails. Moreover, in response to the Court's questions during the hearing, Petitioner conceded that, at best, he was simply testifying that he would have considered a plea without cooperation, not that he would have accepted the plea offer. (*Id.* at 118). Put simply, Petitioner's inconsistent testimony in this regard is insufficient to show prejudice from alleged ineffective assistance of counsel because Petitioner has failed to demonstrate a reasonable probability that he would have accepted any of the plea offers.

Additionally, to assert a successful ineffective assistance of counsel claim, it is very helpful if there is objective evidence in addition to the petitioner's self-serving assertions. *See Purdy*, 337 F.3d at 259. As to the claim here that Mr. Goldstein never communicated any plea offer, still excluding Mr. Convissar's and AUSA Guerra's testimony to the contrary, there is simply no objective evidence to that effect.

Petitioner argues that, even assuming the plea offers were conveyed to him, a significant disparity between a plea offer and actual sentencing is sufficient objective evidence of ineffective assistance of counsel. (Dkt. 261 at 16 (citing *United States v. Brown*, 623 F.3d 104, 112 (2d Cir. 2010)). Citing to Mr. Guerra's notes indicating an offense level of "36 etc.," Petitioner argues that he was not advised of the impact of a possible conviction since his offense level was not 36, but 40—elevating his guideline sentence to 35 years to life. (*Id.* at 18-19). The Court cannot agree with Petitioner in categorizing this as "incorrectly calculated" guidelines—the "etc." clearly represents that 36 was not the final calculation made or conveyed to Mr. Goldstein. (*Id.* at 18).

Further, Petitioner highlights Mr. Goldstein's erroneous sentencing memorandum seemingly to bolster the argument that Petitioner was not apprised of the risks of trial. (*Id.* at 8). The Court finds this evidence too weak. Representing in a sentencing filing that 360 months to life was inclusive of Petitioner's gun charges could have been a simple typographical error, and in any event, it was not so grossly erroneous as to the time Petitioner was facing so as to constitute reliable objective evidence. The difference between the 360 months to life or 420 months to life—5 years—is not a significant enough time period to have prejudiced Petitioner's ability to make a reasoned decision as to whether to take a plea deal where, as here, plea offers were as low as between 10 and 12 years. Even the difference between 12 years and 30 years is large enough to apprise Petitioner of the significant risks of going to trial.

However, even assuming that the above is compelling objective evidence, the standard articulated in *Brown*, and cited by Petitioner, is: "[A] defendant's statements that

he would have accepted a plea offer 'in combination with' 'some objective evidence,' such as 'a significant sentencing disparity,' is sufficient to support a prejudice finding." *Brown*, 623 F.3d at 112. Here, again, Petitioner's own testimony is not consistent. Given Petitioner's vacillation between whether he would only have *considered* a 10-12 year plea, or whether he definitely would have *taken* it, the Court cannot find that even under Petitioner's own testimony, he was prejudiced. *Compare* (Dkt. 257 at 118, 122), *with* (Dkt. 257 at 106, 107-108).

## CONCLUSION

For the foregoing reasons, the Court denies Petitioners § 2255 petition on the basis of ineffective assistance of counsel. Because the Court finds that Petitioner has failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. *See* 29 U.S.C. § 2253(c)(2).

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: May 25, 2017
        Rochester, New York